UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| DIANA NAYOKPUK, ) | |
|        Plaintiff, ) | 2:09-cv-0009 JWS |
|     vs. ) | ORDER AND OPINION |
| UNITED STATES OF AMERICA, ) | [Re: Motion at Docket 40] |
|        Defendant. ) | |

## I. MOTION PRESENTED

At docket 40, plaintiff Diana Nayokpuk ("plaintiff" or "Nayokpuk") moves for a ruling that the *Sweet*[1] presumption of negligence applies. Defendant United States of America ("the government") opposes the motion at docket 69. Nayokpuk's reply is at docket 74. Oral argument was not requested and would not assist the court.

## II. BACKGROUND

This lawsuit arises out of the medical treatment of A.N. ("A.N."), who is Nayokpuk's daughter. A.N. is Alaska Native and lives in the village of Shishmaref. In

---

[1] *Sweet v. Sisters of Providence*, 895 P.2d 484 (Alaska 1995).

many remote Alaskan villages, there are no doctors. First-line medical care is instead provided by Community Health Aides ("CHAs"), who are supervised by doctors at regional hospitals. CHAs examine patients locally and then telephone the doctors who receive calls in the "radio room." Upon examining a patient, CHAs complete a Patient Encounter Form ("PEF") which describes the patient's complaints, symptoms, current medications, vital signs, and the CHA's assessment. The PEFs are then faxed to the doctor at the regional hospital. After talking to the doctor over the phone, CHAs generally record the doctor's diagnosis on the PEF.

A.N. was born on September 1, 2007. On September 27, 2007, A.N. was found to have a temperature of 102.4. She was transported to Norton Sound Regional Hospital ("NSRH") in Nome, Alaska, where a full bacteriological work-up was done. She was treated with two antibiotics. On November 13, 2007, A.N. was taken to NSRH again after her temperature was recorded at 103.1. Again a bacteriological work-up was done, and A.N. returned to Shishmaref on November 16, 2007.

On January 28, 2008, A.N. went to her village clinic with a temperature of 99.5. Gwen Nayokpuk was the CHA who examined her. She reported the encounter to Dr. Livermont at NSRH. Dr. Livermont prescribed Tylenol and amoxicillin. Plaintiff maintains that the government has been unable to produce the faxed PEF that Dr. Livermont would have reviewed. Dr. Livermont has no recollection of treating A.N..

On February 1, 2008, A.N. was taken back to the clinic with a temperature of 100. A different CHA, Frieda Eningowuk ("Eningowuk"), treated her. Eningowuk assessed A.N. and thought that she had a common cold. Eningowuk contacted Dr. Head at NSRH, and Dr. Head ordered a continuation of Tylenol and amoxicillin. A.N. was scheduled to be in Anchorage, Alaska, the following week, where she had an appointment scheduled at the Alaska Native Medical Center ("ANMC"). Plaintiff maintains that the government has been unable to produce any notes made by Dr. Head regarding his treatment or diagnosis, although plaintiff was provided with the PEF and the faxed PEF.

On February 3, 2008, A.N. returned to the clinic after her mother reported that her cold had worsened. She was seen again by Gwen Nayokpuk. A.N. was having difficulty breathing and was coughing up discharge. She had a fever of 100.2. Gwen Nayokpuk diagnosed A.N. with bronchiolitis and contacted Dr. Sharma at NSRH. Dr. Sharma ordered a continuation of amoxicillin and saline nebulizer treatments to help A.N.'s breathing. Plaintiffs maintain that the government has been unable to produce the PEF that was faxed to Dr. Sharma.

A.N. was brought back to the clinic on February 5, 2008, with a temperature of 102.8. She was still coughing, displayed an audible wheezing, was picking at her ears, and her upper lip was blue. Eningowuk was the on-duty CHA, and she called Dr. Sharma. Dr. Sharma authorized A.N. to be flown to NSRH on the next commercial flight. Dr. Sharma does not recall treating or evaluating A.N..

A.N. was flown to Nome later that day. She was examined by Dr. Superville at NSRH and diagnosed with a viral respiratory infection and bronchospasm. She returned to Shishmaref on February 7.

A.N. returned to the village clinic on February 19, 2008, and was examined by CHA Amelia Milligrock ("Milligrock"). A.N. was vomiting and coughing, and she had a temperature of 102.9. Her right tympanic membrane was red and bulging, and she had lesions on her mouth. Milligrock diagnosed A.N. with acute otitis media and bronchiolitis. A.N. visited the clinic a second time on February 19 because her feet were turning blue, and her temperature had increased to 104. Eningowuk was on duty, and she called Dr. Superville at NSRH. Dr. Superville ordered A.N. to be transported to NSRH that evening. Her flight could not land due to weather, and A.N. was therefore rescheduled for a flight on the morning of February 20. Plaintiff maintains that there are no records of the reasons for A.N.'s transport and no record of Dr. Superville's treatment.

A.N. was taken to the clinic again at 2:45 a.m. on February 20. Her temperature had risen to 104.5 and she had an irregular pulse. Eningowuk contacted Dr. Logan at

NSRH. Dr. Logan prescribed 100 mg of Rocephin, a dosage that plaintiff claims was insufficient. Dr. Logan does not recall his treatment of A.N., and plaintiff maintains that there is no contemporaneous record of his treatment of her.

Although A.N. was scheduled to be flown to Nome later that morning, the transport order was cancelled. Plaintiff maintains that there is no record of the order cancelling the transport.

Later on February 20, A.N. returned to the clinic and was seen by Milligrock. Her fever had decreased to 99.6. Milligrock spoke with Dr. Sharma who ordered that A.N. be seen again the next day. Dr. Sharma does not recall treating A.N., and plaintiff maintains that there is no record of her thoughts or impressions.

A.N. returned to the clinic on February 22, 2008. Her temperature was 100.8, and her hands and feet were blue. Milligrock contacted Dr. Logan who ordered that A.N. be kept warm and rechecked in two days. A.N. returned to the clinic on February 24, 2008, with a temperature of 102.2. Eningowuk contacted Dr. Superville who diagnosed unresolved bronchiolitis and authorized A.N. to be transported to NSRH the next morning. A.N. was transported to Nome on February 25, 2008. At approximately 3:15 p.m., A.N. began seizing. She was ultimately transported to Alaska Native Medical Center ("ANMC") in Anchorage. A lumbar puncture was performed which allowed doctors to identify the specific bacteria that had infected A.N..

Plaintiff maintains that the delay in diagnosing and treating A.N.'s meningitis caused irreversible brain damage and that A.N. will require intensive care for the rest of her life. Plaintiff filed a complaint against the United States, pursuant to the Federal Tort Claims Act, on November 11, 2009. The complaint alleged negligence on the part of care providers at NSRH and ANMC, whose employees are deemed employees of the United States for purposes of the FTCA by virtue of compacts between those entities and the Indian Health Service. The complaint was amended to plead recklessness on June 17, 2011.

### III.  DISCUSSION

The FTCA provides that the United States is liable for the "negligent or wrongful act[s] or omission[s] of any employee . . . if a private person . . . would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[2] Here, the alleged acts or omissions occurred in Alaska and, therefore, Alaska law governs disposition of plaintiff's claims.

Nayokpuk maintains that her doctors had a duty to create and maintain appropriate records of her treatment and that her doctors breached that duty. Because her doctors allegedly breached that duty, she argues that her ability to prove malpractice is impaired and that the court should therefore apply a rebuttable presumption of negligence.[3]

**A.  The *Sweet* Presumption**

In *Sweet*, the Alaska Supreme Court held that where a medical malpractice plaintiff's ability to prove negligence is impaired by the defendant's breach of duty to create or maintain adequate records, a trial court should shift the burden of proof to the defendant to prove by a preponderance of the evidence that it was not negligent.[4] "[A] plaintiff must first establish to the satisfaction of the court that the absence of the records hinders his ability to establish a prima facie case."[5] Second, "burden shifting should only occur when the essential medical records are missing through the negligence or fault of the adverse party."[6]

---

[2] 28 U.S.C. § 1346(b)(1).

[3] *See Sweet*, 895 P.2d at 492.

[4] *Id.*

[5] *Id.* at 491.

[6] *Id.* (citing *Public Health Trust v. Valcin*, 507 So.2d 596, 599 (Fla. 1987)).

**1. Whether the Presumption is Substantive**

In suits brought under the FTCA, courts apply state substantive law and federal procedural law.[7] The government's primary argument in response to plaintiff's motion is that the *Sweet* presumption is procedural and therefore should not be applied in this FTCA action. The government maintains that *Sweet* has been treated by Alaska courts as a discovery sanction. Plaintiffs respond that the presumption is substantive and that its application is mandated by Federal Rule of Evidence 302 and extension of the *Erie* doctrine.[8]

Federal Rule of Evidence 302 provides that "[i]n a civil case, state law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision."[9] The advisory committee notes make clear that although not "all presumptions in diversity cases are governed by state law," state law presumptions apply where "the burden of proof question ha[s] to do with a substantive element of [a] claim or defense."[10] The *Sweet* presumption affects the burden of proof as to the substantive elements of duty, breach, and causation.[11] It is therefore applicable pursuant to Federal Rule of Evidence 302.

The government argues that Alaska "cases have consistently held that the burden-shifting of *Sweet* is a remedy for discovery issues, not substantive law."[12] The government is correct that the burden shifting has been recognized by Alaska courts as

---

[7] *See, e.g.*, *Taylor v. United States*, 821 F.2d 1428, 1432 (9th Cir. 1987).

[8] *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[9] Fed. R. Evid. 302.

[10] *Id.* advisory committee's note.

[11] *Sweet*, 895 P.2d at 492.

[12] Doc. 69 at 8.

a discovery sanction.[13]  *Sweet* makes clear, however, that burden shifting is "equally applicable in the context of the breach of the duty to create records."[14]  *Nichols*,[15] like *Sweet*, declined to recognize an independent tort for negligent spoliation of evidence. However, the court saw "no reason why the *Sweet* remedy would not be a sufficient response" to the alleged negligent spoliation.[16]  *Nichols* actually undermines the government's position–the Alaska Supreme Court recognized *Sweet*'s application outside the context of an independent spoliation claim.  In any event, use of burden shifting to remedy discovery violations does not operate to the exclusion of burden shifting as a substantive rule.

The government argues that AS 09.55.540 bars substantive presumptions in medical malpractice cases.  That statute states that "[i]n malpractice actions there is no presumption of negligence on the part of the defendant."[17]  The government maintains that "the Alaska Legislature has determined that the burden of proof can never rest upon a health care provider" and "*Sweet* therefore must be viewed as a procedural tool used by Alaska courts to resolve issues concerning discovery."[18]  However, as Nayokpuk points out, *Sweet* post-dates enactment of AS 09.55.540 by almost three decades.  The fact that *Sweet* did not discuss AS 09.55.540 indicates that the Alaska Supreme Court did not see that statute as a bar to the rule it prescribed.  Moreover, there are no cases suggesting that AS 09.55.540 retroactively bars the *Sweet*

---

[13]*See, e.g.*, *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 29–30 (Alaska 1998).

[14]*Sweet*, 895 P.2d at 494 n.9 (citing *Patrick v. Sedwick*, 391 P.2d 453 (Alaska 1964)).

[15]*Nichols v. State Farm Casualty Co.*, 6 P.3d 300, 304 (Alaska 2000).

[16]*Id.*

[17]AS 09.55.540(b).

[18]Doc. 69 at 9–10.

presumption. Finally, even though the legislative history cited in *Priest v. Lundig*[19] suggests that the statute was intended to counter *Patrick*, *Patrick* did not involve burden shifting–the Alaska Supreme Court found that the plaintiff "did enough under the circumstances to *make out a prima facie case of negligence.*"[20]

The court concludes that the *Sweet* rule is substantive and potentially applicable to plaintiff's claims under the FTCA.

**2. Whether *Sweet*'s Requirements Are Met**

    **a. Whether Nayokpuk's Ability to Make out a Prima Facie Case is Impaired**

Nayokpuk argues that "[c]ritical medical records . . . were lost, destroyed, or . . . never created."[21] Therefore, Nayokpuk maintains, application of the *Sweet* presumption is appropriate. The government responds that Nayokpuk is able to make a prima facie case of negligence without the disputed records, and that a trier of fact must determine whether the absence of any records is attributable to negligence.

The text of *Sweet* is clear–"the absence of the records [must] hinder[] [a plaintiff's] ability to establish a prima facie case."[22] Elsewhere in the opinion, the Alaska Supreme Court describes the standard as "impairment."[23] Contrary to the government's assertion, the absence of the records does not need to wholly preclude establishment of a prima facie case.

---

[19] 583 P.2d 173, 175–76 n.7 (Alaska 1978).

[20] *Patrick*, 391 P.2d at 456 (emphasis added).

[21] Doc. 40 at 39.

[22] *Sweet*, 895 P.2d at 491.

[23] *See, e.g., id.* ("Just as the missing records may have impaired the Sweets' ability to prove medical negligence, they would in the same way impair the Sweets' ability to prove a causal connection between any negligence and Jacob's injuries.").

Nayokpuk argues that "[t]here are no contemporaneous records of the radio room doctors' evaluation and diagnosis of A.N." and that "[t]he only records available are PEF forms filled out by CHAs, which do not contain any notes and differential diagnoses by the radio room doctors."[24] The government argues that Nayokpuk's experts are able to form opinions that "A.N.'s age, symptoms and medical history required that she be brought to Nome for a full sepsis workup."[25] However, as Nayokpuk points out, without such records, "A.N. is limited in her ability to prove what her doctors knew and when they knew it."[26] Nayokpuk's ability to prove breach is therefore impaired.

Nayokpuk argues, for instance, that there is no record of why Dr. Superville's transport order of February 19 was cancelled, why NSRH did not administer an IV or IO, why Nayokpuk was prescribed Rocephin, how the appropriate dosage of Rocephin was determined, or Dr. Sharma's diagnosis. Notwithstanding other theories of liability, it is clear that the absence of certain records impairs Nayokpuk's ability to make out a prima facie case of negligence.

### b. Whether the Missing Records Are Attributable to the Negligence of Defendant

*Sweet* also requires that "burden shifting should only occur when the essential medical records are missing through the negligence or fault of the adverse party."[27] Nayokpuk argues that NSRH had a duty, under *Patrick*, to create certain records and that NSRH breached that duty. Nayokpuk notes that NSRH's 30(b)(6) representative

---

[24]Doc. 40 at 40.

[25]Doc. 69 at 13.

[26]Doc. 40 at 40.

[27]*Sweet*, 895 P.2d at 492.

admitted that failure to keep certain records would violate the standard of care.[28] The government responds that application of *Sweet* is premature. The government is correct that "[w]hat [p]laintiff[] is seeking here is essentially a summary judgment in a tort action."[29] Although plaintiff has supported her assertion that defendant breached its duty under *Patrick* to create adequate records, the government has not responded to plaintiff's assertions in a manner such that the court can treat the issue as adequately briefed. For example, the government states that it will present testimony that "the providers' record-keeping was within the standard of care" at trial.[30] Elsewhere, defendant states that it "will assert that the standard of care did not require them to be created."[31] Finally, Nayokpuk did not identify a procedural vehicle for her motion. The question of whether any of the providers breached their duty to create adequate medical records requires a determination that can only be fully determined in connection with a motion for summary judgment under Rule 56 or trial.

## V. CONCLUSION

For the reasons above, plaintiff's motion at docket 40 is **GRANTED in part** consistent with the discussion in this order and **DENIED in part** without prejudice to a motion for partial summary judgment on the issue of whether the care providers breached any duty to create or maintain adequate records of A.N.'s treatment. If plaintiff believes the remaining issues can be determined on a motion for summary

---

[28]*See* doc. 40 at 51 (citing doc. 43-11).

[29]Doc. 69 at 14.

[30]*Id.*

[31]*Id.*

judgment, any such motion shall be filed within 14 days from the date of this order. Otherwise, application of the *Sweet* presumption will be resolved at trial.

DATED this 30th day of January 2012.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE