# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| DIANA NAYOKPUK, | )<br>) |
| Plaintiff, | ) 2:09-cv-00009 JWS<br>) |
| vs. | ) ORDER AND OPINION<br>) |
| UNITED STATES OF AMERICA, | ) [Re: Motion at Docket 77]<br>) |
| Defendant. | )<br>) |

## I. MOTION PRESENTED

At docket 77, plaintiff Diana Nayokpuk ("plaintiff" or "Nayokpuk") moves pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment that the *Sweet*[1] presumption of negligence applies. Defendant the United States of America ("the government") opposes the motion at docket 100. Nayokpuk's reply is at docket 107. Oral argument was not requested and would not assist the court.

---

[1] *Sweet v. Sisters of Providence*, 895 P.2d 484 (Alaska 1995).

-1-

## II. BACKGROUND[2]

This lawsuit arises out of the medical treatment of A.N., who is Nayokpuk's daughter. A.N. is Alaska Native and lives in the village of Shishmaref. In many remote Alaskan villages, there are no doctors. First-line medical care is instead provided by Community Health Aides ("CHAs"), who are supervised by doctors at regional hospitals. CHAs examine patients locally and then telephone the doctors who receive calls in the "radio room." Upon examining a patient, CHAs complete a Patient Encounter Form ("PEF"), which describes the patient's complaints, symptoms, current medications, vital signs, and the CHA's assessment. The PEFs are then faxed to the doctor at the regional hospital. After talking to the doctor over the phone, CHAs generally record the doctor's diagnosis on the PEF.

A.N. was born on September 1, 2007. On September 27, 2007, A.N. was found to have a temperature of 102.4. She was transported to Norton Sound Regional Hospital ("NSRH") in Nome, Alaska, where a full bacteriological work-up was done. She was treated with two antibiotics. On November 13, 2007, A.N. was taken to NSRH after her temperature was recorded at 103.1. Again a bacteriological work-up was done, and A.N. returned to Shishmaref on November 16, 2007.

On January 28, 2008, A.N. went to her village clinic with a temperature of 99.5. Gwen Nayokpuk was the CHA who examined her. She reported the encounter to Dr. Livermont at NSRH. Dr. Livermont prescribed Tylenol and amoxicillin. Plaintiff maintains that the government has been unable to produce the faxed PEF that Dr. Livermont would have reviewed. Dr. Livermont has no recollection of treating A.N.

On February 1, 2008, A.N. was taken back to the clinic with a temperature of 100. A different CHA, Frieda Eningowuk ("Eningowuk"), treated her. Eningowuk assessed A.N. and thought that she had a common cold. Eningowuk contacted Dr. Head at NSRH, and Dr. Head ordered a continuation of Tylenol and amoxicillin.

---

[2]This background is taken from the order at docket 76.

A.N. was scheduled to be in Anchorage, Alaska, the following week, where she had an appointment scheduled at the Alaska Native Medical Center ("ANMC"). Plaintiff maintains that the government has been unable to produce any notes made by Dr. Head regarding his treatment or diagnosis, although plaintiff was provided with the PEF and the faxed PEF.

On February 3, 2008, A.N. returned to the clinic after her mother reported that her cold had worsened. She was seen again by Gwen Nayokpuk. A.N. was having difficulty breathing and was coughing up discharge. She had a fever of 100.2. Gwen Nayokpuk diagnosed A.N. with bronchiolitis and contacted Dr. Sharma at NSRH. Dr. Sharma ordered a continuation of amoxicillin and saline nebulizer treatments to help A.N.'s breathing. Plaintiffs maintain that the government has been unable to produce the PEF that was faxed to Dr. Sharma.

A.N. was brought back to the clinic on February 5, 2008, with a temperature of 102.8. She was still coughing, displayed an audible wheezing, was picking at her ears, and her upper lip was blue. Eningowuk was the on-duty CHA, and she called Dr. Sharma. Dr. Sharma authorized A.N. to be flown to NSRH on the next commercial flight. Dr. Sharma does not recall treating or evaluating A.N.

A.N. was flown to Nome later that day. She was examined by Dr. Superville at NSRH and diagnosed with a viral respiratory infection and bronchospasm. She returned to Shishmaref on February 7.

A.N. returned to the village clinic on February 19, 2008, and was examined by CHA Amelia Milligrock ("Milligrock"). A.N. was vomiting and coughing, and she had a temperature of 102.9. Her right tympanic membrane was red and bulging, and she had lesions on her mouth. Milligrock diagnosed A.N. with acute otitis media and bronchiolitis. A.N. visited the clinic a second time on February 19 because her feet were turning blue and her temperature had increased to 104. Eningowuk was on duty and she called Dr. Superville at NSRH. Dr. Superville ordered A.N. to be transported to NSRH that evening. Her flight could not land due to weather, and A.N. was therefore

rescheduled for a flight on the morning of February 20. Plaintiff maintains that there are no records of the reasons for A.N.'s transport and no record of Dr. Superville's treatment.

A.N. was taken to the clinic again at 2:45 a.m. on February 20. Her temperature had risen to 104.5, and she had an irregular pulse. Eningowuk contacted Dr. Logan at NSRH. Dr. Logan prescribed 100 mg of Rocephin, a dosage that plaintiff claims was insufficient. Dr. Logan does not recall his treatment of A.N., and plaintiff maintains that there is no contemporaneous record of his treatment of her.

Although A.N. was scheduled to be flown to Nome later that morning, the transport order was cancelled. Plaintiff maintains that there is no record of the order cancelling the transport.

Later on February 20, A.N. returned to the clinic and was seen by Milligrock. Her fever had decreased to 99.6. Milligrock spoke with Dr. Sharma who ordered that A.N. be seen again the next day. Dr. Sharma does not recall treating A.N., and plaintiff maintains that there is no record of her thoughts or impressions.

A.N. returned to the clinic on February 22, 2008. Her temperature was 100.8, and her hands and feet were blue. Milligrock contacted Dr. Logan who ordered that A.N. be kept warm and rechecked in two days. A.N. returned to the clinic on February 24, 2008, with a temperature of 102.2. Eningowuk contacted Dr. Superville who diagnosed unresolved bronchiolitis and authorized A.N. to be transported to NSRH the next morning. A.N. was transported to Nome on February 25, 2008. At approximately 3:15 p.m., A.N. began seizing. She was ultimately transported to Alaska Native Medical Center ("ANMC") in Anchorage. A lumbar puncture was performed which allowed doctors to identify the specific bacteria that had infected A.N.

Plaintiff maintains that the delay in diagnosing and treating A.N.'s meningitis caused irreversible brain damage and that A.N. will require intensive care for the rest of her life. Plaintiff filed a complaint against the United States, pursuant to the Federal Tort Claims Act, on November 11, 2009. The complaint alleged negligence on the part

-4-

of care providers at NSRH and ANMC, whose employees are deemed employees of the United States for purposes of the FTCA by virtue of compacts between those entities and the Indian Health Service. The complaint was amended to plead recklessness on June 17, 2011.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[4] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[5] In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.[6] The reviewing court may not weigh evidence or assess the credibility of witnesses.[7] The burden of persuasion is on the moving party.[8]

## IV. DISCUSSION

The FTCA provides that the United States is liable for the "negligent or wrongful act[s] or omission[s] of any employee . . . if a private person . . . would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[9]

---

[3] Fed. R. Civ. P. 56(a).

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5] *Id.*

[6] *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[7] *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[8] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[9] 28 U.S.C. § 1346(b)(1).

Here, the alleged acts or omissions occurred in Alaska and, therefore, Alaska law governs disposition of plaintiff's claims.

In *Sweet*, the Alaska Supreme Court held that where a medical malpractice plaintiff's ability to prove negligence is impaired by the defendant's breach of duty to create or maintain adequate records, a trial court should shift the burden of proof to the defendant to prove by a preponderance of the evidence that it was not negligent.[10] "[A] plaintiff must first establish to the satisfaction of the court that the absence of the records hinders his ability to establish a prima facie case."[11] Second, "burden shifting should only occur when the essential medical records are missing through the negligence or fault of the adverse party."[12]

The court has already determined that the plaintiff's case has been impaired by the absence of certain records.[13] The only question therefore is whether that impairment is due to defendants' breach of any duty to create records.

Nayokpuk argues that NSRH had a duty, under *Patrick v. Sedwick*,[14] to create certain records and that NSRH breached that duty. In that case, the Alaska Supreme Court held that doctors have a duty to create records that "accurately and fully" describe any actions "of consequence."[15] Doctors must record "what was observed and [what was] done."[16] The court noted that it was disinclined to "permit the absence of personal recollection or of recorded facts to serve as a defense under the circumstances of" the

---

[10]*Id.*

[11]*Id.* at 491.

[12]*Id.* (citing *Public Health Trust v. Valcin*, 507 So.2d 596, 599 (Fla. 1987)).

[13]Doc. 76 at 8–9.

[14]391 P.2d 453 (Alaska 1964).

[15]*Id.* at 457.

[16]*Id.*

-6-

case.[17] At least three of the doctors who treated A.N. have no recollection of treating her.

**A. Transport Order and Dosage of Rocephin**

The government concedes that:

> there are some omissions in the records that leave certain questions unanswered. The government [also] concedes there are certain records that are either missing or do not exist. There is no record of why the transport order of February 19 was cancelled. There is no record explaining why 100mg of Rocephin was prescribed. It is not contested that this was an inadequate dosage.[18]

Nonetheless, defendants argue that not every record that could have been made would assist Nayokpuk's case.[19] For instance, defendants argue that because Nayokpuk's expert has testified that A.N. should have been transported to Nome on February 20, and that 100mg of Rocephin was an insufficient dosage, Nayokpuk has not been impaired in her ability to assert a prima facie case. The court has already ruled that the absence of those records impairs plaintiffs' ability to prove negligence. The court also concludes that a failure to document cancellation of A.N.'s transport order and failure to document prescription of an insufficient amount of Rocephin fell short of the doctors' duty under *Patrick*.

**B. PEFs and Other Disputed Records**

The government argues that the records that do exist are adequate. Specifically, one of the government's experts stated that the PEFs, which are created and maintained by the CHAs, adequately incorporate the radio room doctors' feedback.[20] The same expert also stated that he would have no recommendations regarding

---

[17] *Id.* at 458.

[18] Doc. 100 at 2.

[19] *Id.*

[20] Doc. 100-4 at 3.

-7-

appropriate changes to NSRH records-keeping procedures.[21] Plaintiff's experts have opined that the documentation of A.N.'s treatment was, in general, "egregiously insufficient,"[22] and that the tendency of doctors in Nome to rely on CHAs to record interaction with patients was insufficient.[23] The differing impressions of the record-keeping practice in rural Alaska illustrate that there are disputed issues of fact that preclude summary judgment with respect to application of the *Sweet* presumption based on the existing records of A.N.'s treatment.[24]

In *Sweet*, the court cautioned that the presumption should be applied only "absent a jury finding that [the health care provider's] failure to maintain [the plaintiff's] records was excused."[25] Although the present dispute will be resolved at a bench trial, the *Sweet* court's statement clearly contemplates that not all issues governing application of the doctrine may be resolved beforehand.[26] That is the case here, with respect to the records that do exist.

The expert testimony relied on by the government also precludes application of the *Sweet* presumption on the basis of some of the records that plaintiff argues should have been created but were not. For instance, plaintiff maintains that when A.N. arrived at NSRH on February 25, and began to seize, the standard of care required that an IV or IO be administered and that a lumbar puncture and full bacteriological workup be performed. Plaintiff's argument hinges on whether they are correct that A.N.'s medical

---

[21] *Id.* at 1.

[22] Doc. 78-12 at 5.

[23] *See, e.g.*, doc. 78-14 at 3.

[24] *See, e.g.*, *Miller v. Phillips*, 959 P.2d 1147, 1254 (Alaska 1998) (interpreting *Sweet* to have rested on "uncontroverted proof of lost or inadequate records").

[25] *Sweet*, 895 P.2d at 492.

[26] *See also Miller*, 959 P.2d at 1254 ("[T]he adequacy and completeness of the medical records was a hotly disputed factual issue.").

-8-

1 care providers breached the standard of care by not performing those actions.  If the
2 standard of care did not require those steps, there would be no reason to document
3 their absence.  Although the defendant's 30(b)(6) representative did state that the type
4 and length of A.N.'s seizure should have been documented,[27] unlike other potential
5 bases for application of the presumption, the absence of documentation of that
6 information does not impair Nayokpuk's ability to make out a prima facie case of
7 negligence.

## V.  CONCLUSION

For the reasons above, plaintiffs' motion at docket 77 is **GRANTED** in part and **DENIED** in part as follows:

1) It is granted with respect to the medical care providers' failure to document cancellation of A.N.'s transport order, and with respect to the medical care providers' failure to document the basis for the dosage of Rocephin prescribed.

2) It is denied with respect to other potential bases for application of the *Sweet* presumption–in particular, the faxed PEFs, and the general absence of firsthand records from the radio room doctors.  The court will decide whether to apply the *Sweet* presumption based on the adequacy of those and other records after hearing all of the evidence at trial.

DATED this 22nd day of May 2012.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[27]Doc. 78-2 at 8.

-9-